# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 2, 2020

## IN RE ADALEIGH M. ET AL.

**Appeal from the Juvenile Court for Grainger County**
**No. 2018JV39, 2018JV38   Steven Lane Wolfenbarger, Judge**

_____

## No. E2019-01955-COA-R3-PT
_____

FILED

MAR **3 1** 2021

Clerk of the Appellate Courts
Rec'd by_____

A mother and father appeal the termination of their parental rights to their two children. The juvenile court concluded that there was clear and convincing evidence of multiple statutory grounds for termination.  The court also concluded that there was clear and convincing evidence that termination of their parent's parental rights was in each child's best interest.  Although the court's factual findings related to one of the grounds were lacking, clear and convincing evidence supports the remaining statutory grounds for termination and the best interest determination.  So we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON II J., joined.

Jordan Long, Knoxville, Tennessee, for the appellant, Harley M.

Cameron Beier, Morristown, Tennessee, for the appellant, Miranda M.

Herbert H. Slatery III, Attorney General and Reporter, Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I.

### A.

After her birth in April 2018, Alaynna M. exhibited withdrawal symptoms and was diagnosed with neonatal abstinence syndrome ("NAS"). In a subsequent investigation by the Tennessee Department of Children's Services ("DCS"), the child's mother, Miranda M. ("Mother"), admitted using oxymorphone, oxycodone, and other controlled substances during the course of her pregnancy. Mother also reported domestic violence issues involving the child's father, Harley M. ("Father").

Following its investigation, DCS petitioned the juvenile court to transfer legal custody of Alaynna and her two-year-old sibling, Adaleigh. DCS alleged the children were dependent and neglected and severely abused. The court granted DCS temporary custody, and the children were initially placed with a relative.

Just over three months later, the court concluded that there was clear and convincing evidence that both children were dependent and neglected. The court found that Mother "by her own admission . . . in open court . . . did in times past use drugs together [with Father], including Opanas, and that she ha[d] been a victim of domestic abuse." Mother's testimony and medical records also "clearly established that . . . she . . . use[d] [illicit] drugs during her pregnancy, . . . specifically Opanas, Roxicodone, and Subutex, knowing that she was pregnant." So the court concluded Mother's "actions constituted severe abuse as to the child, Alaynna."

As for Father, he had been incarcerated for much of Mother's pregnancy and was only released from a drug rehabilitation program about six days prior to Alaynna's birth. But "he admittedly openly used drugs with the mother" prior to his incarceration. And he had perpetrated domestic violence against Mother. The court concluded, however, that the evidence was less than clear and convincing that he used drugs with Mother knowing that she was pregnant or that the domestic violence occurred during the pregnancy.

The court allowed DCS to retain custody, and the children were placed with foster parents. But the court granted the parents "supervised visitation, not to include overnight visitation." The court also ratified a family permanency plan.

The permanency plan sought to assist the parents with providing a safe and stable home environment free from illegal drug use. To that end, the plan required Mother and Father to submit to and pass random drug screens; to advise DCS if they were prescribed narcotic medication and to request non-narcotic alternatives; to provide DCS a

2

personalized step-down plan if either was prescribed Suboxone as a treatment for addiction; to take medications as prescribed and provide DCS with prescriptions; and to allow pill counts. Mother was required to continue her intensive outpatient treatment to address her substance abuse, and Father was required to have another alcohol and drug assessment if he had a positive drug screen.

The plan also required Mother and Father to resolve all legal issues; not to incur any new criminal charges; and to participate in a mental health assessment and follow all recommendations. Both parents had to provide a transportation plan, proof of a legal source of income sufficient to meet their needs and those of their children, and maintain safe and suitable housing for a minimum of six months. To address domestic violence, the plan required both parents to attend anger management classes. Father was required to attend offender domestic violence classes; Mother was required to attend non-offender domestic violence classes.

A second permanency plan created late the same year added some additional requirements based on the parents' continuing struggles. Both parents failed drug screens, so the second plan required them to have alcohol and drug assessments and to follow any recommendations. Domestic violence remained a concern, and the second plan asked that the parents demonstrate what they had learned through domestic violence/anger management classes. They had to complete a parenting assessment and follow any recommendations. They also had to attend NAS training to appreciate Alaynna's medical condition and attend 50% of Alaynna's weekly medical appointments and all routine appointments for Adaleigh.

In February 2019, DCS created a third permanency plan without the involvement of the parents. They had been invited to a meeting to discuss the plan, but the parents cancelled due to a medical emergency involving a family member. The parents were present at the ratification hearing for the plan later that same month. The third permanency plan included the same requirements as the second plan but added adoption as a possible goal. The third permanency plan would be the last.

As a result of Father's failure to report to probation, sometime in April 2019, a warrant was issued for his arrest. Father returned to jail on June 15, 2019.

B.

On June 27, 2019, DCS petitioned to terminate the parental rights of Mother and Father. As to both parents, the petition alleged abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, persistence of conditions,

3

and failure to manifest a willingness and ability to assume custody of the children.[1] As to Mother only, the petition alleged severe child abuse, and as to Father only, the petition alleged abandonment by conduct exhibiting a wanton disregard for the children's welfare.

At trial, the court heard testimony from Mother, Father, DCS case managers, and the children's foster mother. The court also heard from an employee of Omni Community Health who had conducted some of the classes required by the permanency plans and facilitated therapeutic visits between the parents and the children.

The court terminated the parental rights of both parents. The court concluded that there was clear and convincing evidence of each statutory ground asserted by DCS. It also concluded that there was clear and convincing evidence that termination was in each child's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those circumstances in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1- 113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear

---

[1] At trial, DCS dismissed a claim that the parents had abandoned the children by failure to support them.

and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A.

On appeal, Father challenges each of the statutory grounds relied on by the juvenile court for terminating his parental rights. Mother challenges all statutory grounds for terminating her parental rights other than the ground of severe abuse. Both argue that the evidence does not clearly and convincingly support the conclusion that termination of their respective parental rights was in each child's best interest.

### 1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). Statute defines "abandonment" in multiple ways. *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (Supp. 2020) (defining the term "abandonment"). The court concluded that both parents had abandoned the children under one of the definitions and that Father had also abandoned the children under a separate definition applicable to incarcerated parents.

### a. Abandonment by Failure to Establish a Suitable Home

The second definition of "abandonment" considers whether a child has a suitable home to return to after the child's court-ordered removal from the parent. *Id.* § 36-1-102(1)(A)(ii). Under Tennessee Code Annotated § 36-1-102(1)(A)(ii), termination of parental rights may be appropriate if:

> (a) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is

5

a dependent and neglected child, and the child was placed in the custody of [DCS] . . . ;

(b) The juvenile court found . . . that [DCS] . . . made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, [DCS] . . . made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

*Id.*

A "suitable home" means something "more than a proper physical living location." *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). A suitable home requires "[a]ppropriate care and attention . . . to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014).

We conclude that the evidence clearly and convincingly supports the finding of abandonment by failure to provide a suitable home. The facts establish that both children were removed from the physical and legal custody of the parents and placed in the custody of DCS due to a dependency and neglect proceeding. The facts also establish that the children's circumstances prevented reasonable efforts from being made prior to their removal.

DCS made efforts to assist both parents to establish a suitable home. Among other efforts, a DCS case manager met with the parents to review the initial family permanency plan, and the parents were enrolled in classes to address anger management, domestic violence, and parenting skills. DCS provided individualized assistance with fulfilling the various requirements of the permanency plans. And DCS arranged for in-home services and therapeutic visitation. Meanwhile, the parents' efforts were lacking.

When Alaynna was born, and during the dependency and neglect proceedings, Father and Mother were living with a man who raised Mother. But that stay ended when the man attempted to run over Mother. In September 2018, Mother and Father relocated

6

to a camper, but the camper burned down in December 2018. Mother and Father then moved about the homes of various family members.

Both Father and Mother counter that they have made progress toward providing a suitable home and that they will be able to provide a suitable home at an early date. But the record does not support their contention. Father was incarcerated at the time of trial, and even if he was released at the earliest estimated time, December 12, 2019, he still anticipated spending another six months in a halfway house. Mother testified that she was "staying with a friend" in a camper in Johnson City. She was not sure who owned the camper, but she planned to stay there for another month or two. Although Mother claimed that she had been clean from opiates since August 2018, as recently as December 2018 Mother tested positive for Suboxone. Mother also failed to participate in a drug test that DCS attempted to administer in June 2019.

### b. Abandonment by Wanton Disregard

Another definition of "abandonment" may apply if the parent is incarcerated when the petition for termination is filed or had been incarcerated within the four-month period preceding the filing of the petition. Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 2019).[2] At the time the petition to terminate was filed against Father, the incarcerated or formerly incarcerated parent was deemed to have abandoned a child if he:

> either ha[d] failed to visit or ha[d] failed to support or ha[d] failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . ha[d] engaged in conduct prior to incarceration that exhibit[ed] a wanton disregard for the welfare of the child.

*Id.*

The court found that Father had engaged in conduct exhibiting a wanton disregard for the welfare of both children. "Wanton disregard" is not a defined term. "[A]ctions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in

---

[2] The Legislature amended this definition of "abandonment" in 2020. Act of March 6, 2020, ch. 525, sec. 1, 2020 Tenn. Pub. Acts 43. We apply the version of the statute in effect at the time DCS filed its petition to terminate. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

7

combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68.

Clear and convincing evidence supports the court's finding that Father's pre-incarceration conduct exhibited wanton disregard for each child's welfare. Father was incarcerated when the petition for termination was filed. And Father, who was twenty-two years old and still in jail at the time of trial, admitted that he had been in and out of jail since he turned eighteen.

On appeal, Father attempts to explain the "few times" he was incarcerated since Adaleigh's birth. According to Father, the main reason for his various incarcerations have been "because he has not shown up for court dates or probation[,] not because he has picked up new criminal charges." But his criminal record along with his drug use was more than sufficient to support the wanton disregard determination. Father acknowledges "substance abuse issues" since Adaleigh's birth. In addition to abusing opiates, Father also "smoke[d] pot every now and then."

2. Substantial Noncompliance

Another ground for termination is "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2020). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy were "reasonable and [we]re related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (Supp. 2020). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

We agree with the juvenile court that the permanency plan requirements were reasonable and related to remedying the conditions that necessitated foster care. The children entered foster care due to Mother's drug abuse and domestic violence issues. To address these issues, the permanency plans required Father and Mother to submit to and pass random drug screens; to advise DCS if they were prescribed narcotic medication; to provide DCS a personalized step-down plan if either was prescribed Suboxone as a treatment for addiction; to take medications as prescribed and provide DCS with prescriptions; and to allow pill counts. Mother was required to continue her intensive outpatient treatment to address her substance abuse, and Father was required to have another alcohol and drug assessment if he had a positive drug screen. To address domestic violence, the plan required both parents to attend domestic violence/anger management classes.

Next, we must determine whether the parent's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49.

8

"Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

We conclude that the evidence is clear and convincing that Father and Mother failed to substantially comply with the requirements of the permanency plans. The proof revealed, and DCS acknowledges on appeal, that Father and Mother completed domestic violence and anger management classes, that they participated in some drug treatment and parenting classes, and that Father completed an alcohol and drug assessment. But, otherwise, the requirements of the plans went largely unfulfilled.

Mother failed to address her substance abuse issues. She would not participate in drug tests, and she did not complete an intensive outpatient drug rehabilitation program. Neither parent, although they both took Suboxone, provided a step-down plan. Father admitted relapsing after his April 2018 release from rehab. And Mother sometimes used Suboxone without a prescription.

Father failed to resolve his legal issues, and he exacerbated them by evading arrest before returning to jail. Father also failed to demonstrate what he had learned from anger management class. He became angry and left a supervised visit. The employee of Omni Community Health distinctly remembered one anger management class in which Father "was swearing to the point that [she] became so uncomfortable for [her] own safety that [she] ended the class within . . . a half-hour of starting it." Father told one DCS case manager that he would prefer nerve pills over anger management.

Neither parent completed a parenting assessment, and they failed to prepare for Alaynna's medical condition by attending NAS training. They also expressed skepticism of the NAS diagnosis.

3. Persistence of Conditions.

The juvenile court also found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The ground of persistence of conditions focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. So the question before the court is "the likelihood that the child can be safely returned to the custody of the

9

[parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. Persistence of conditions may be a basis to terminate parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

At the time of trial, the children had been removed from the parents' custody for more than six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B) ("The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard."). And this record contains clear and convincing evidence that the conditions preventing the children's safe return remained. Neither parent had successfully addressed their drug addiction, although Father was forced to remain drug-free in jail. And, despite the anger management classes, DCS witnessed argumentative behavior between Mother and Father. The employee of Omni Community Health also observed angry outbursts by Father. The DCS case manager testified that, not only were the parents in no condition to take the children back, she was concerned that the children's safety would be at risk.

We further conclude that the evidence is clear and convincing that there was little likelihood that these conditions would be remedied in the near future. Father was jailed and anticipated an extended stay at a halfway house after his release. At trial, Mother was pregnant with her third child, and she conceded that her unborn child was her focus:

10

[R]ight now I cannot focus on the [permanency plan required] classes. . . . [T]he classes are not going to help me be ready for this baby. . . . I know that I should have already done them and that is my fault, but, you know, I am going to be stable enough to take care of me and this baby by the time it gets here so if I am going to be stable enough to do that . . . .

Continuation of the parent-child relationship would also diminish the children's opportunity for an early integration into a safe, stable, and permanent home. Their foster mother testified that the girls were bonded to her and her husband and calling them "mama" and "daddy." Foster mother and her husband felt a similar bond to the children. Foster mother also testified that, although they were willing to continue to foster the children, they "would love to adopt, if it leads in that direction."

4. Severe Abuse

Under Tennessee Code Annotated § 36-1-113(g)(4), a parent's rights may be terminated if "[t]he parent . . . has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). To prove this ground against Mother, DCS entered into evidence the adjudicatory, severe abuse, and permanency hearing order in which the juvenile court found clear and convincing evidence that Mother committed severe child abuse against Alaynna as defined by Tennessee Code Annotated § 37-1-102.

On appeal, Mother does not challenge the ground of severe child abuse. Still, we "must review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

Based on the admission of the adjudicatory, severe abuse, and permanency hearing order, clear and convincing evidence supported the court's conclusion that severe child abuse was a basis for terminating Mother's parental rights. After considering the testimony and exhibits, the court in its prior order concluded that Mother had committed severe child abuse against her daughter, Alaynna, as defined in Tennessee Code Annotated § 37-1-102. In the same order, the court adjudicated Adaleigh and Alaynna dependent and neglected, in part, based on the severe child abuse finding. And the order was not appealed. *See In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (holding the issue of whether a mother committed severe child abuse was res judicata where the issue was fully litigated in a previous dependency and neglect action).

11

5. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Child

Finally, the court found termination of both parents' rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14) (Supp. 2020). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

In its order, the court only makes factual findings relative to the first prong of the failure to manifest ground. And on appeal, DCS does not defend the ground as a basis for terminating either parents' rights.

The parental termination statute requires "an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). As our supreme court has observed, we "routinely remand[] contested termination cases to the trial court for failure to make findings of fact and/or conclusions of law, whether related to the grounds for termination or the child's best interests." *In re Angela E.*, 303 S.W.3d at 251; *e.g., In re Autumn D.*, No. E2020-00560-COA-R3-PT, 2020 WL 6306056, at *5 (Tenn. Ct. App. Oct. 28, 2020) (vacating the order on the failure to manifest ground for not including a specific finding regarding a risk of substantial harm and remanding for the trial court to make the necessary findings of fact and conclusions of law); *In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019) (vacating the order terminating parental rights and remand "compelled" where the court failed to make specific findings regarding each of the elements of a statutory ground for termination); *In re Haley S.*, No. M2017-00214-COA-R3-PT, 2018 WL 1560078, at *10 (Tenn. Ct. App. Mar. 29, 2018) (vacating the termination of parental rights and remanding for sufficient findings of fact and conclusions of law regarding the grounds for termination and the best interest of the child).

Yet, a child's permanent placement "should not be unnecessarily delayed due to a remand for findings on alternate grounds." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). So we have recognized that a remand is inappropriate when it would not serve the interest of any party. *See White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). This is true in a case when sufficient factual findings support alternative statutory grounds for termination of parental rights. *See In re Mickeal Z.*, 2019 WL 337038, at *13 n.8

12

(noting we "sometimes found a remand to be unnecessary in cases of insufficient findings when another ground for termination has been established"). Because four other statutory grounds support termination of Father's and Mother's parental rights, we decline to remand this case for further factual findings on one element of the failure to manifest ground. Instead, we determine that the failure to manifest ground cannot support termination of the parental rights.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

After considering the statutory factors, the juvenile court determined that the termination of parental rights was in the children's best interest. The first two statutory factors consider the parents' current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for lasting change. *Id.* § 36-1-113(i)(2). The court found that the parents had not made an adjustment in their lifestyle or living conditions. The parents had also "failed to take advantage of many of the things that were offered to them to make a lasting adjustment such as the children could be returned to them."

The next two statutory factors examine the parent's relationship with the child. The third factor looks at the consistency of visitation. *See id.* § 36-1-113(i)(3). The fourth addresses the quality of the parent's relationship with the child, whether it is "meaningful." *Id.* § 36-1-113(i)(4). The court found that the parents had "not really maintained regular visitation or contact with the Children." It also found no evidence of a meaningful relationship given the "inconsistency of visitation and some of the issues that ha[d] occurred at the visitations."

The fifth factor considers the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The court found

that there had been a relatively recent change in foster parents, but otherwise, it found the evidence lacking on the effect of any change. Thus, it did not find the factor applicable.

The sixth factor asks whether the parent or a person residing with the parent "ha[d] shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." *Id.* § 36-1-113(i)(6). The seventh factor focuses on the parents' home environment and ability to be a safe and stable caregiver. *Id.* § 36-1-113(i)(7). The court found "a history of domestic violence between Father and Mother," as well as "a history of use of controlled substances." Father was currently incarcerated and had a history of criminal activity. The court described the parents' living situation as "nomadic." In sum, both factors weighed in favor of termination.

The eighth statutory factor evaluates the parents' mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision of the child." *Id.* § 36-1-113(i)(8). The court noted the history and drug use of the parents, and it found that "to the extent that they [we]re continuing to use or they [we]re impaired that certainly would prevent them from being able to effectively parent the children."

The ninth factor examines the parents' child support history. *Id.* § 36-1-113(i)(9). Although each parent was ordered to pay $30 per month in child support in August 2018, the court found no payments had been made in the four-month period leading up to the filing of the petition to terminate. Father made payments in September and December 2018 and February 2019, totaling $110. Mother made payments in September, November, and December 2018, totaling $57.36.

Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535. We agree with the juvenile court that the proven facts amount to clear and convincing evidence that termination is in each child's best interest.

### III.

Because the juvenile court failed to make sufficient factual findings as to each element, the ground of failure to manifest an ability and willingness to assume custody or financial responsibility was not a proper ground for terminating Father's and Mother's parental rights. But clear and convincing evidence supports four other statutory grounds for terminating their rights. Clear and convincing evidence also supports the determination

14

that termination was in each child's best interest.  So we affirm the judgment terminating Father's and Mother's parental rights.

s/ W. Neal McBrayer
W. NEAL McBRAYER, JUDGE
